RENDERED: FEBRUARY 7, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0271-WC

ESTATE OF KYLE PERKINS,
BY MEGAN PERKINS, ADMINISTRATOR;
MEGAN PERKINS, INDIVIDUALLY;
MEGAN PERKINS, AS COURT APPOINTED
GUARDIAN CONSERVATOR AND NEXT
FRIEND OF JUNIOR WINSTON PERKINS,
A MINOR; AND MEGAN PERKINS AS COURT
APPOINTED GUARDIAN CONSERVATOR
AND NEXT FRIEND OF BODHI MARSHAL
PERKINS, A MINOR                                                     APPELLANTS


                      PETITION FOR REVIEW OF A DECISION
v.              OF THE WORKERS' COMPENSATION BOARD
                          ACTION NO. WC-21-01615


NORTH AMERICAN STAINLESS;
HONORABLE AMANDA PERKINS,
ADMINISTRATIVE LAW JUDGE; AND
COMMONWEALTH OF KENTUCKY
WORKERS' COMPENSATION
BOARD                                                                   APPELLEE

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND L. JONES, JUDGES.

JONES, L., JUDGE: On November 22, 2021, Kyle Perkins (Mr. Perkins) died from complications stemming from a double lung transplant necessitated by his infection with COVID-19. Prior to his death, Mr. Perkins applied for workers' compensation benefits alleging COVID-19 constituted an occupational disease which he contracted while working at North American Stainless (NAS). Following a hearing, the Administrative Law Judge (ALJ) dismissed the case for failure to prove a work-related injury. In an initial appeal, the Workers' Compensation Board (the Board) vacated the order of the ALJ and remanded with instructions to join Mr. Perkins' widow, Megan Perkins (Ms. Perkins), and his children as parties. No new evidence was presented by the newly joined parties, thus the ALJ issued a new opinion entirely consistent with the first, merely adding the joined parties. Ms. Perkins again appealed to the Board which affirmed the decision of the ALJ. Ms. Perkins petitions this Court for review of the decision to deny workers' compensation benefits, claiming the ALJ failed to consider the workplace conditions at NAS in her analysis, and failed to properly determine whether those conditions placed Mr. Perkins at greater risk from COVID-19 than the general public. Finding no error, we affirm.

-2-

## I. Factual Background

Prior to his death, Mr. Perkins filed an application for workers' compensation benefits from NAS using Form 102, alleging he suffered from an occupational disease. The ALJ heard the testimony of Ms. Perkins and her mother Tracy Yocum (Yocum) who lived with the Perkins family; and Mr. Perkins' co-workers Eric Springer (Springer), Aaron Witt (Witt), and Mike Hardy[1] (Hardy). The ALJ also reviewed the opinions and testimony of Dr. Michael Anstead on behalf of Ms. Perkins and Dr. Thomas Parker for NAS.

Ms. Perkins claims Springer exposed her husband to COVID-19 during the 12-hour shift they worked together on August 8, 2021. Mr. Perkins and Springer were mechanical maintenance technicians at NAS, working 12-hour swing shifts with five other individuals known as "C-Crew." Though there were six workers in C-Crew, they worked in pairs. Mr. Perkins and Springer were paired together. The men's schedule had them working three consecutive days followed by two days off, then working two days followed by three days off. Because the facility at NAS was so large, Mr. Perkins and Springer used a golf cart to travel between locations throughout their shift. Neither Mr. Perkins nor Springer was vaccinated for COVID-19, and both men received warnings from Hardy for failing to wear their face masks on July 31, 2021.

---

[1] Mike Hardy was the supervisor for Mr. Perkins and Springer.

On August 15, 2021, Mr. and Ms. Perkins and Springer all tested positive for COVID-19. Mr. Perkins and Springer had worked together on August 2, August 3, August 6, August 8, August 11, and August 12, 2021. From August 1, 2021, until August 15, 2021, Ms. Perkins admits she visited friends, traveled to Louisville, went shopping, went to a doctor's office, ate at a minimum of two restaurants, and worked outside the home. She also admits that Mr. Perkins went to Louisville, went to an outdoor sporting event, and went to restaurants during this time. Springer also admitted to attending an outdoor sporting event and camping during the relevant timeframe. There was conflicting evidence of whether Mr. Perkins visited other locations during this time.

Mr. Perkins began showing symptoms of illness on August 11, 2021. He felt worse on August 12, 2021. On August 13, 2021, still complaining of his own illness, Mr. Perkins texted Springer and informed him that Ms. Perkins had been diagnosed with pneumonia.[2] She was not tested for COVID-19.

Springer began to feel ill the night of August 14, 2021. On August 15, he tested positive for COVID-19. Springer contacted Mr. Perkins and learned both he and Ms. Perkins were at the hospital being tested for COVID-19. Both were positive. They were released from the hospital that day, but Mr. Perkins returned.

---

[2] Ms. Perkins denies she was diagnosed with pneumonia but admits she did go to the doctor complaining of sinus problems.

He was eventually transferred to the University of Kentucky hospital (UK) where he remained until his death.

While at UK, Mr. Perkins was treated by pulmonologist Dr. Michael Anstead from September 25, 2021, until November 22, 2021. According to Dr. Anstead, spending 15 to 30 minutes within six feet of an unmasked person with COVID-19 constitutes significant exposure to the virus. He claimed the course of Mr. Perkins' illness was consistent with exposure to COVID-19 at work on August 8, 2021, but conceded that he based his conclusion on the history he received from the Perkins family. Dr. Anstead performed no independent investigation to verify the family's claims or to determine if Mr. Perkins and Springer were infected with the same viral strain. Dr. Anstead acknowledged that because symptoms of COVID-19 can manifest anywhere from two to fourteen days after exposure, Mr. Perkins could have contracted the COVID-19 virus at home, from his wife, at multiple locations other than NAS, or on a day other than August 8, 2021. Ultimately, Dr. Anstead admitted it was unlikely Mr. Perkins contracted COVID-19 from exposure to Springer on August 8, 2021, if Springer had no symptoms of COVID-19 until August 14, 2021.

Dr. Thomas Parker, a board-certified physician in internal, pulmonary, and critical care medicine, never had the opportunity to personally examine Mr. Perkins or review his medical records. At the request of NAS, Dr. Parker reviewed

the opinion letter of Dr. Anstead and the depositions of Ms. Perkins, Yocum, Springer, Witt, and Hardy. Dr. Parker described the very contagious nature of COVID-19 which is spread in droplet form by individuals who are infected whether they are symptomatic or asymptomatic, masked or unmasked. He said masked persons with COVID-19 could still pass the disease to another person if they were within six feet of one another for 30 minutes or more. Based on the timing of the onset of symptoms in both men, Dr. Parker also found it unlikely that Mr. Perkins contracted COVID-19 from Springer.

After reviewing the evidence, the ALJ found Ms. Perkins failed to meet her burden of proving Mr. Perkins' COVID-19 was a work-related occupational disease. Ms. Perkins argues the ALJ erred in applying the law under Kentucky Revised Statutes (KRS) 342.0011(3) by finding COVID-19 was not "incidental to the character of NAS's business" because the ALJ looked at working conditions of the steel industry rather than looking at those conditions specific to what Mr. Perkins experienced while employed at NAS. Ms. Perkins describes the conditions at NAS as a "crowded work environment" where Mr. Perkins' duties as a maintenance technician required him to "work in pairs within [six] feet" of Springer for "virtually the entire 12-hour shift." She also claims the ALJ incorrectly applied the "increased risk analysis" set forth in *Dealers Transport Co. v. Thompson*, 593 S.W.2d 84 (Ky. App. 1979).

## II. Standard of Review

On review, neither the Board nor an appellate court can substitute its judgment for that of the ALJ as to the weight of the evidence concerning questions of fact. *Shields v. Pittsburgh and Midway Coal Mining Co.*, 634 S.W.2d 440, 441 (Ky. App. 1982). Pursuant to KRS 342.285, the ALJ is the exclusive fact-finder in a workers' compensation claim. This means the ALJ has the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence and to draw reasonable inferences from that evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). Furthermore, the ALJ has sole discretion to decide whom and what to believe and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977).

The role of an appellate court is "to correct the Board only where . . . the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *ViWin Tech Windows & Doors, Inc. v. Ivey*, 621 S.W.3d 153, 157 (Ky. 2021) (quoting *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)).

## III. Legal Analysis

Occupational disease is a subset of workplace injury under KRS

342.0011. KRS 342.0011 provides as follows:

> An occupational disease . . . shall be deemed to arise out
> of the employment if there is apparent to the rational
> mind, upon consideration of all the circumstances, a
> causal connection between the conditions under which
> the work is performed and the occupational disease, *and*
> which can be seen to have followed as a natural incident
> to the work as a result of the exposure occasioned by the
> nature of the employment *and* which can be fairly traced
> to the employment as the proximate cause.

KRS 342.0011(3) (emphasis added). A communicable disease, such as COVID-19,

however, is excluded from the definition of "injury" by KRS 342.0011(1) "unless

the risk of contracting the disease is increased by the nature of the employment."

There are two ways a claimant can prove an increased risk exists:

> [A]n occupational disease may be found if there is
> substantial evidence that *either* employment conditions
> specifically affected the employee in a manner resulting
> in contraction of disease, *or* employment conditions
> generally can to a reasonable medical probability cause a
> particular disease or condition in a given class of
> workers.

*Dealers Transport*, 593 S.W.2d at 88 (emphasis added) (citing *Princess Mfg. Co.

v. Jarrell*, 465 S.W.2d 45 (Ky. 1971)). Therefore, both the "nature of the

employment" and the "conditions under which the work is performed" are

relevant.

A. <u>The ALJ and the Board considered the specific conditions at NAS.</u>

Ms. Perkins argues the decisions of both the ALJ and the Board were flawed because they were based solely on an analysis of the steel manufacturing industry rather than the conditions at NAS. We disagree. Multiple times, both the ALJ and the Board refer to the specific conditions at NAS which required Mr. Perkins to spend most of his 12-hour shift within six feet of Springer. However, the ALJ concluded:

> While finding that COVID-19 was not an occupational hazard in most workplaces, the [United States] Supreme Court agreed there were special workplace factors that would increase a worker's exposure to COVID-19, such as working in particularly crowded or cramped environments.
>
> The ALJ is not persuaded [Mr. Perkins'] work conditions at NAS, *i.e.*, working within six feet of Springer for a 12-hour shift, constituted a work environment that was "particularly crowded or cramped."

Opinion of the ALJ, September 14, 2023, p. 21 (citing *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022)).

The Board affirmed the ALJ's decision:

> We are unable to take issue with the ALJ's findings there is no persuasive evidence [COVID-19] is incidental to the nature of NAS' business and no evidence that its workers as a class were more likely and more susceptible to contracting it than the public at large. As noted by the ALJ, both medical experts offering opinions in this case concluded the exposure could have occurred in multiple places and neither could definitively state [COVID-19] is

-9-

> a disease incidental to the character of NAS' business operations as required by the statute. Further, neither physician opined the working environment of the NAS workers is so unique as to cause the workers to be more susceptible to contracting [COVID-19] than the general public.

Opinion of the Board, February 5, 2024, p. 58. Therefore, because both the general conditions of the industry as well as the individual conditions experienced by Mr. Perkins were appropriately considered in their analysis, we find no error in the application of KRS 342.0011(3) by either the Board or the ALJ.

> B. <u>Proof of increased risk does not remove claimant's burden to prove a causal connection between the work and the injury.</u>

A claimant bears the burden of proving every element of her case. *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 928 (Ky. 2002). This includes proving that the alleged workplace injury arose out of the employment. *Jefferson County Pub. Sch./Jefferson County Bd. of Educ. v. Stephens*, 208 S.W.3d 862, 866 (Ky. 2006). When the ALJ finds against the claimant having the burden of proof, the claimant must show on appeal "the ALJ misapplied the law or that the evidence in [their] favor was so overwhelming that it compelled a favorable finding." *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005).

In *Dealers Transport*, the decedent, a truck driver working on the loading docks, was diagnosed with pneumonia after working long shifts outdoors in freezing cold and inclement weather. *Dealers Transport*, 593 S.W.2d at 87. His

pneumonia became severe and eventually led to his death. *Id*. at 86. Because pneumonia was "an ordinary disease of life" the court found the source of the illness could not be traced to his employment "beyond, at most, a mere possibility," nor was it an ailment common in the industry. *Id.* at 88. Finding the claimant thereby failed to satisfy either prong of the established test to prove the existence of an occupational disease, the court stated: "The mere possibility of disease exposure is not sufficient to meet the burden of proof as to disease causation." *Id*. However, the court still affirmed the award of benefits to claimant under a theory of workplace injury rather than occupational disease, saying "communicable disease can be an injury within the meaning of the Act. But, it does not follow that a communicable disease must always meet the occupational disease criteria in order to be covered." *Id*. The court went on to explain that "the statute does not rule out coverage for communicable diseases where the risk of contracting such disease is increased by the nature of the employment." *Id*. at 89. Ms. Perkins relies heavily on this conclusion. However, there is a significant distinction. The claimant in *Dealers Transport* established causation:

> [Claimant] . . . produce[d] competent medical testimony by two doctors from which it could be inferred that the conditions under which decedent worked could have lowered his resistance to pneumonia or could have caused a mild viral infection to become much more severe [–] even fatal. The Board chose to believe this testimony as was its fact-finding prerogative.

*Id.* at 88. Thus, the death in *Dealers Transport* was "causally attributable to working conditions [and was] therefore compensable." *Id.* at 90.

Ms. Perkins uses other portions of *Dealers Transport* to support her argument that the ALJ and the Board incorrectly concluded Mr. Perkins was under no greater risk of COVID-19 at NAS than members of the general public. However, we need not reach those arguments. Whether or not she is correct, increased risk alone is not enough to establish the causal connection required by KRS 342.0011(1) and demanded by *Dealers Transport*. Whether steel workers as a class or Mr. Perkins in particular were at an increased risk for contracting COVID-19, there is no compensable injury if the injury is not "causally attributable" to the workplace.

Proving causation poses a particularly difficult challenge for a workers' compensation claimant alleging injury due to a highly contagious and widespread disease such as pneumonia or COVID-19. The United States Supreme Court advised:

> COVID-19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases.

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 118 (2022). In *Dealers Transport*, the court was adamant that its

holding was "[n]ot intended to be read as a precedent for a flood of claims based on colds, grippe and endless other common ills allegedly arising out of employment." *Dealers Transport*, 593 S.W.2d at 90. Furthermore, the court added, "the compensable injury of this case is not the viral infection per se, but the work-related aggravation of it which resulted in death. By that standard[,] this is not an actual exposure to disease case and no precedent in that regard." *Id*. Finally, the court repeated that "the proof presented here was sufficient to establish causation." *Id*. Ms. Perkins has failed to meet that burden.

There was conflicting evidence about Mr. Perkins' activities in the time leading up to his illness. Ms. Perkins' and Yocum's testimonies were contradicted by Mr. Perkins' own text messages and the testimony of his co-workers. The ALJ decided: "Regardless of whether [Mr. and Ms. Perkins] went to a party at the Parker's[3] or when and where they went out to eat, the ALJ finds [Ms. Perkins] failed to prove beyond a mere possibility that [Mr. Perkins] was actually exposed to COVID-19 at work." Opinion of the ALJ, September 14, 2023, p. 22. The ALJ also found: "While Dr. Anstead determined [Mr. Perkins'] progression of symptoms was consistent with exposure on August 8, 2021, he also

---

[3] There were multiple events at the residence and farm of Brian Parker in early August 2021. Ms. Perkins admits she visited the Parker home on August 5, 2021. Eric Springer attended outdoor races at the Parker farm on August 7, 2021. There was a party at the Parker home on the evening of August 8, 2021, and there is conflicting evidence whether Mr. Perkins attended. It is alleged that several persons who attended events on the Parker property became ill with COVID-19.

-13-

agreed it was possible he could have contracted COVID-19 the day before or after as symptoms begin anywhere from two to fourteen days after exposure." *Id*. The ALJ paid close attention to the timeline of symptoms in Ms. Perkins, Mr. Perkins, and Springer: "Since [Mr. and Ms. Perkins] started developing symptoms around the same time, Dr. Anstead also indicated it was just as likely she gave COVID-19 to [him] as he gave it to her." *Id*. And, "because [Mr. Perkins] had symptoms before Springer [Dr. Parker said] it was more likely that [Mr. Perkins] gave Springer COVID-19 instead of Springer giving [Mr. Perkins] COVID-19." *Id*. at 23. The ALJ favorably quoted Dr. Parker as saying, "we cannot prove where people get their infections from because this virus is so contagious." *Id*. at 22. Ms. Perkins identified no other employee at NAS who had COVID-19 during the time frame in which Mr. Perkins became ill. In particular, she identified no other employee besides Springer with whom Mr. Perkins worked closely during his shifts. The ALJ noted that Dr. Anstead indicated RNA testing could determine whether [Mr. Perkins] and Springer were infected with the same strain of the virus. *Id*. However, identifying the strain would not solve the mystery of who contracted COVID-19 first or where or how they contracted the virus.

The ALJ was in the best position to review the evidence and her review was extensive, setting forth ample support for her decision. After noting Ms. Perkins failed to file a Petition for Reconsideration, the Board upheld the

-14-

ALJ's factual findings: "[O]ur task is to determine whether substantial evidence supports the ALJ's conclusions. After a review of the record, we conclude the ALJ's decision is supported by substantial evidence." Opinion of the Board, February 5, 2024, p. 77.

Ms. Perkins takes issue with a comment made by the Board that there was *no* evidence Springer was unmasked on August 8, 2021. She points to a photograph taken of Springer on her husband's phone that day which shows Springer unmasked at NAS at that moment in time. While the Board's isolated statement may have been incorrect, both the Board and the ALJ referred to the photograph elsewhere in their opinions. We find the photograph is not dispositive in light of the totality of the ALJ's findings of fact, and the Board's comment is harmless error. This is particularly true because [Mr. Perkins] and Springer worked a 12-hour shift together that day which, based on the testimony of both Dr. Anstead and Dr. Parker could have resulted in COVID-19 passing from one to the other whether they were masked or unmasked.

Ms. Perkins also relies on the weight of Dr. Anstead's testimony to support her claims of error. However, the Board believed the "views Dr. Anstead articulated represent nothing more tha[n] conflicting evidence compelling no particular result." Opinion of the Board, February 5, 2024, p. 82 (citing *Copar, Inc. v. Rogers*, 127 S.W.3d 554 (Ky. 2003). The Board determined:

> Dr. Anstead's testimony as to where and when [Mr. Perkins] contracted [COVID-19] is far from unequivocal. His testimony, is in large part, premised upon what he was told by the family. As fact-finder, the ALJ is vested with the authority to weigh the medical evidence, and if "the physicians in a case genuinely express medically sound, but differing, opinions as to the severity of a claimant's injury, the ALJ has the discretion to choose which physician's opinion to believe."

Opinion of the Board, February 5, 2024, p. 87.

We conclude that there was substantial evidence to support the ALJ's findings of fact and cannot say there was gross injustice in the Board's determination that Ms. Perkins failed to establish a causal connection between Mr. Perkins' illness and his work at NAS.

We view any remaining contentions of error as moot or without merit.

## IV. Conclusion

For the foregoing reasons, we affirm the Opinion and Order of the Board dated February 5, 2024, upholding the dismissal of the claim for benefits due to Mr. Perkins' illness and death.

ALL CONCUR.

BRIEF FOR APPELLANT:

Ruth H. Baxter
Jake A. Thompson
Carrollton, Kentucky

BRIEF FOR APPELLEE NORTH AMERICAN STAINLESS:

Sean M. Whitt
Brent M. House
Ashland, Kentucky

-16-